UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

CAROL A. MANGUS,

        Plaintiff,

     v.                             Case No. 04-C-0026

METAVANTE CORPORATION,
RODNEY SCHULZ,

        Defendants.

DECISION AND ORDER
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING AS
MOOT ALL REMAINING MOTIONS IN LIMINE, AND DISMISSING CASE

Metavante Corporation hired Carol Magnus on December 29, 2000, paid her moving expenses, and provided temporary housing in Milwaukee. By the end of her first year, Mangus still had not sold her house in Iowa and asked that she be allowed to telecommute. Metavante acquiesced. Mangus, who was placed on a Performance Action Plan, admits that there were problems with her projects and communication issues while she was "remote." In February of 2003, her supervisor made the decision to revoke the Telecommuting Agreement and asked her to return to Milwaukee within thirty days.

Mangus, who suffered a knee injury in October of 2002, felt that returning to Milwaukee was unreasonable. The Human Resources Department gave her 90 days to report to Milwaukee. However, Mangus preferred two alternative solutions: an additional six months to heal from the surgery, or reassignment to another job that would allow her to telecommute. Because the Americans with Disabilities Act and the Iowa Civil Rights Act

did not require Metavante to take such action, defendants' motion for summary judgment will be granted.

FINDINGS OF FACT

This case was filed in the Southern District of Iowa, Western Division, but transferred to the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1404(a). (Aff. Ploor ¶ 7, Ex. E) This court has subject matter jurisdiction under 28 U.S.C. §1331.

Metavante is a technology service provider to the financial services industry. (Dep. Mangus, p. 100) Its headquarters is located in Brown Deer, Wisconsin. (Aff. Cooke, ¶ 2)

Rodney Schulz and Brian Kammerer interviewed Mangus after she applied for a job with Metavante in 2000. (Dep. Mangus, p. 91, Ex. 1004; Aff. Schulz, ¶ 2) They hired her on December 29, 2000, as a Project Manager in the EPS-Project Manager Department earning $70,000 per year. (Dep. Mangus, pp. 13, 92, 99, 100, Exs. 1002, 1005) In that position, Mangus planned, controlled, and managed project team tasks aligned with Metavante's business objectives. (Dep. Mangus, pp. 96-97, Ex. 1006) Metavante's methodology for projects consists of: (1) developing a project schedule/plan and a project issue log; (2) building the project to scope and requirement specifications, functional design specifications, and technical design specifications; (3) performing a code and unit test and quality assurance test; and (4) implementation. (Aff. Schulz, ¶ 3)

Schulz supervised Mangus. (Dep. Mangus, p. 92) Initially, Schulz reported to Kammerer, later to Mary Alexander, then to Thomas Keyes, and finally to Debbie Hammer. (Dep. Mangus, pp. 105-06; Aff. Schulz, ¶ 2; Aff. Hammer, ¶ 2; Aff. Cooke, ¶ 8)

2

Mangus supervised five to twenty individuals on a project. (Dep. Mangus, pp. 96-97, Ex. 1006) The complex projects usually involved 2,000 to 10,000 hours of manpower. (Dep. Mangus, pp. 96-97) Schulz would assign Mangus a project, and then she would be assigned people (resources) from other areas of Metavante to complete the project. (Dep. Mangus, p. 107)

Systems Manager Deborah Hammer supervised the managers of these resources. (Dep. Mangus, p. 108; Aff. Hammer, ¶ 2) Hammer reported to Software Development Manager Thomas Grimm. (Mangus Dep. at 108-109; Cooke Aff. ¶ 8; Hammer Aff. ¶2).

Mangus believes that Schulz "sometimes" micromanaged the people he supervised, but he micromanaged her less when she was "remote." (Dep. Mangus, p. 129-130) During her deposition, Mangus testified that all Project Managers complained about Schulz. (Dep. Mangus, p. 131)

Schulz paid attention to details regarding some things. (Dep. Mangus, p. 131) For instance, Schulz liked to have project plans completed, and wanted plans updated regularly. (Dep. Mangus, p. 132) Also, Schulz liked detailed milestones, with specific dates, which needed to be updated. (Dep. Mangus, p. 132) Schulz did not accept excuses when these items were not done, and told Mangus that he wanted her to use detailed planning in her projects. (Dep. Mangus, p. 132)

Mangus acknowledges that she and Schulz differed in work styles. (Dep. Mangus, p. 133) She is not good with paperwork whereas Schultz followed the rules and preferred form and structure. (Dep. Mangus, pp. 133-134) Schulz treated all of the Project Managers the same in this regard. (Dep. Mangus, p. 134)

3

In her deposition, Mangus identified her following weakness: not good at paperwork, not a good administrator, and she doesn't "suffer fools gladly." (Dep. Mangus, pp. 135-136) Occasionally, Schulz advised Mangus to get her plans up to date. (Dep. Mangus, pp. 133-134)

When Metavante hired Mangus, she lived in Sidney, Iowa. (Dep. Mangus, p. 138) She intended to sell her home there and move to Milwaukee. (Dep. Mangus, p. 138) Metavante paid to move her belongings to Milwaukee and provided her with temporary housing. (Dep. Mangus, p. 139)

In March of 2001, Mangus approached Schulz and stated she could no longer maintain two residences. (Dep. Mangus, p. 141) Mangus asked that Metavante either buy her house in Iowa or provide her with money for a down payment on a house in Milwaukee. (Dep. Mangus, p. 141) Also, she asked for assistance with outstanding expenses. (Dep. Mangus, p. 142) While Metavante did not buy Mangus' home in Iowa or give her a down payment for a home in Milwaukee, it helped with her financial situation by allocating $6000 from the resource center to offset some of her costs. (Dep. Mangus, p. 142)

In 2001, Schulz nominated Mangus for a Flexible Leadership Incentive Award for her work on the Data Base Consolidation project. (Dep. Mangus, p. 145, Ex. 1009) She also received her first performance evaluation in December of 2001. (Dep. Mangus, pp. 144-145, Ex. 1008) This 13-page review rated her a "3" on a scale of 1 to 5. (capable). (Dep. Mangus, p. 146, Ex. 1008) Schulz noted problems with the postponement of a project and that "[h]er team needs to build a detailed plan that meets the requirements and minimizes the risks and communicate that plan to the project board

4

and stakeholders early and often through regularly scheduled status meetings. . . . Work with the team to identify detailed remaining work (duration and efforts (hours)) and issues; track them closely to minimize delays and surprises." (Ex. 1008)

The evaluation further noted:

In the future, I encourage Carol to continuously work with her team to detail out the short-term tasks and dependencies to help drive the short term focus while she keeps an eye on the long term milestones. Assuming that Carol's next security projects get approved quickly, I expect Carol to use these methods to maximize her team's contributions by having a very clear direction and understanding of how they are going to get there.

Carol needs to be more organized and use the project manager tools more effectively in team meetings. Carol does a good job of keeping minutes for her meetings to capture what decisions were made in the meeting. However, getting to those decisions tend to take longer than needed. Carol should hold regular status meetings that follow a repeatable agenda so her team members are prepared and bring the necessary materials to maximize the meeting. Likewise, Carol needs to use the PM tools (project plans, issues log, risk matrix, agendas, etc.) at the status meetings to help bring organization and direction to the project.

Carol needs to strengthen her oral communication and listening skills. Improving these skills should help Carol in the following areas: sharing her banking and systems knowledge with others, identifying and reducing gaps with her team in misunderstandings of expectations, leading her team in problem solving, and planning remaining work. A greater attention to detail will give Carol's teams clear and consistent direction.

(Ex. 1008) Mangus received a 4.5% increase in her pay in April of 2002. (Dep. Mangus, Ex. 1010)

In December of 2001, Mangus approached Schulz because her house in Iowa had not sold thereby causing financial strain. (Dep. Mangus, p. 149) Mangus raised

5

with Schulz the possibility of telecommuting from her home in Sidney, Iowa. (Dep. Mangus, p. 149) Schulz asked Mangus to research this proposition, and provided her with Metavante's telecommuting policy. (Dep. Mangus, p. 150, Ex. 1011) This policy provides that telecommuting, "is not an entitlement; it is not a company-wide benefit; and it in no way changes the terms and conditions of employment." (Ex. 1011) It further provides that, "the availability of telecommuting as a flexible work arrangement . . . can be discontinued at any time at the discretion of the employer." (Ex. 1011) To proceed with her request to telecommute, Mangus needed to complete certain forms. (Dep. Mangus, p. 150)

On January 10, 2002, Schulz forwarded to Hammer a proposal allowing Mangus to telecommute. (Dep. Mangus, p. 151, Ex. 1012) Tom Jerger, who was responsible for auditing the performance of Project Managers and setting educational standards and qualifications for Project Managers across the corporation, noted the Company did not have "a long track record of success" in this area (allowing Project Managers to telecommute). (Dep. Mangus, p. 154, Ex. 1012)

Schulz sent Hammer the memorandum regarding Mangus' telecommuting because the arrangement needed her approval. (Dep. Mangus, p. 153) Hammer did not believe project management should be done remotely. (Dep. Mangus, pp. 53-54; Aff. Hammer, ¶ 3) Moreover, Hammer thought that Mangus was a marginal performer who did not provide adequate details for her projects, failed to maintain up-to-date plans, and engaged in limited follow-up on her projects. (Aff. Hammer, ¶ 3) Hammer believed that Mangus did not have the necessary initiative to work on her own at home with minimal supervision. (Aff. Hammer, ¶ 3) Despite her reservations, Hammer told Schulz that the decision was his to make. (Aff. Hammer, ¶ 3)

6

Schulz went out on a limb for Mangus so she could telecommute despite Hammer's reservations. (Dep. Mangus, p. 157) At the time Schulz approved Mangus' request, no one else in his organization telecommuted. (Dep. Mangus, p. 155) Mangus could not identify any EPS Department Project Managers who telecommuted at the time. (Dep. Mangus, p. 156; Aff. Schulz, ¶ 6) Other "remote" staff in the EPS Department at the time of the proposal included: "Leslie Olson (BA – remote Texas), Terry Chandler (BA – remote – Minneapolis), and Chris Lekander (Programmer – remote – Arizona)." (Dep. Mangus, p. 156; Ex. 1012)

Mangus completed a worksheet assessing the possibility of telecommuting. (Dep. Mangus, pp. 151-152, Ex. 1012) She noted that internal customers, unplanned contact, and face-to-face communications posed a challenge if she telecommuted, but that she could be available in person as needed to resolve this issue. (Ex. 1012) Mangus also created a document entitled, "Working Remote in 2002," and proposed courses to "improve interpersonal skills" for long distance communication and "improve project management skills." (Dep. Mangus, p. 152, Ex. 1013)

Mangus created the Telecommuting Agreement between her and Metavante based on a form. (Dep. Mangus, p. 158, Ex. 1014) The Agreement provided that, "the telecommuting arrangement may be discontinued, at will, at any time at the request of either the telecommuter or Metavante provided that written notice is given at least two weeks in advance of the cancellation date." (Ex. 1014)

Mangus began telecommuting in February of 2002. (Ex. 1014; Aff. Schulz, ¶ 6) Metavante retained the right to terminate the Telecommuting Agreement at any time, and did not pay to move Mangus to Iowa. (Aff. Schulz, ¶ 6; (Dep. Mangus, p. 171)

7

Between February of 2002 and February of 2003, Mangus traveled to Milwaukee twice: (1) in May of 2002 to install the First Time Consolidation (FTC) project; and (2) in September of 2002 to install a security project. (Dep. Mangus, pp. 163-64)

Shortly after Mangus began telecommuting, Schulz placed her on a Performance Action Plan to help identify areas where improvement is needed. (Dep. Mangus, p. 167, Ex. 1017; Aff. Cooke, ¶ 4) The Plan stated that Mangus needed to focus on project management execution, including driving efficiencies during analysis and design, driving the completion of specifications, base lining project plans and tracking and over site as well as verbal communication and listening skills. (Ex. 1017) Mangus acknowledges that she could have improved these skills. (Dep. Mangus, p. 172)

The Plan further stated that:

> Carol will work with PMO and her supervisor to strengthen her project management execution skills. Carol will drive efficiencies during analysis and design with her next project by having smaller, quicker milestones and deliverables. These smaller deliverables completed sooner should allow coding to start sooner. Carol should baseline her project plan after analysis and design is completed so it can be evaluated for its effectiveness. Carol should constantly review the plan with her team to drive out assumptions and fill in sub tasks that are in her team member's head and add to the timeline. Carol will complete the e-learning project management series on Control to help strengthen her project management skills. Carol should complete the e-learning classes outlined in her working remote agreement to hone her listening and oral communication skills . . .

(Ex. 1017) According to Mangus, this Plan resulted from different communication styles between Schulz and herself. (Dep. Mangus, pp. 165-66) Schulz told Mangus that he thought she needed to sharpen her communication skills. (Dep. Mangus, p. 169) This plan was not punitive, but instead simply a counseling tool. (Dep. Mangus, p. 166)

8

In 2002, Mangus was responsible for the FTC project. (Dep. Mangus, p. 172) The purpose of this project was to take payments from customers who were making a first payment to a vendor and consolidate the payment into one of the existing electronic vendors as the payment came in the door, thus avoiding sending the first payment out via check resulting in a cost of only 3, versus 50, cents per transaction. (Dep. Mangus, p. 173) This project lasted from June through September 2002. (Dep. Mangus, p. 174)

Mangus was on the Performance Action Plan at the time of this project. (Dep. Mangus, p. 175) Schulz stressed the importance of setting milestones for this project and specifically asked Mangus on June 20th to set milestones with her team. (Dep. Mangus, p. 175) Schulz also told Mangus to meet one-on-one with her team members. (Dep. Mangus, p. 175)

On June 27, 2002, Schulz once again asked Mangus to provide him with a milestone's calendar for the project. (Dep. Mangus, p. 175) Schulz wanted to see specific end dates for the milestones. (Dep. Mangus, p. 176) This was not unique to Mangus - Schulz also wanted to see everyone's milestones. (Dep. Mangus, p. 176)

Mangus acknowledges that she was careful to provide Schulz with information during this time period because she wanted to keep her job, but there were times where she "blew him off." (Dep. Mangus, p. 177) Mangus also acknowledges that she missed deadlines on about six projects. (Dep. Mangus, p. 177) Mangus further acknowledges that Schulz took her deadlines, as well as other employees' deadlines, seriously. (Dep. Mangus, p. 180)

9

In September 2002, after the successful completion of the FTC project, Schulz ended the Performance Action Plan. (Dep. Mangus, p. 194) At that time, Schulz noted:

> Carol effectively used milestones to drive the entire First Time Payment Consolidation Phase I project. She also met regularly with her team members in a 1-on-1 setting to open up communications, set expectations, and get more accurate status updates. The project was successfully installed on 9/8 and has no issues for the first two runs. Carol completed 3 of the 4 e-learning classes on communication. Carol has demonstrated that she is applying what she has learned by more effective updates at the PCB meetings and not repeating herself when updating manager.

(Dep. Mangus, p. 194, Ex. 1020)

In December of 2002, Mangus received her annual performance review. (Dep. Mangus, p. 195, Ex. 1021) This review contained comments from a standard interim evaluation Mangus received in the middle of the year. (Dep. Mangus, p. 194) Throughout the review, Schulz noted the use of milestones and meetings with the FTC project. (Ex. 1021) The review noted:

> Carol has demonstrated the desire to improve, and has taken action steps to improve her verbal communication and listening skills. Carol and I have had many different conversations this year on this topic including ways that I can be more effective coaching her in this area. Carol is making good progress in this area. Recently, I have suggested to Carol that better note taking and better management of her to-do lists may be contributing to the perception of her not listening. Additional focus on improving how she captures and organizes the detail of her tasks/assignments will positively impact her thoroughness and consistency in her verbal updated and completed work assignments. Carol working remotely puts extra importance on the need for her to master these related skills.

(Ex. 1021)

The review noted that several of Mangus' team members stated that Mangus could improve her use of the project deliverables by using the issue log more effectively and, "With Carol being a remote project manager, she will need to continually remind herself that she needs to track items more closely through questions, getting status, and active listening because she is at a disadvantage of not being able to see any of her team member's actions around her." (Ex. 1021) Further, the review observed that most of Mangus' team members commented that communication was an area where Mangus needed to over compensate because she was remote. (Ex. 1021) The review's summary provided:

> Carol has worked very hard to improve her planning skills the last 6 months of 2002. She is establishing milestones much quicker in her development life cycle. I encourage Carol to keep her focus on improving this skill because it is the backbone of project management.

(Ex. 1021) On a scale of 1 to 5, Mangus received a "3" (accomplished). (Ex. 1021) Mangus did not have issues with this review. (Dep. Mangus, p. 196)

Mangus worked on the Data Mining project to improve consolidation of electronic payments and decrease processing expenses. (Aff. Schulz, ¶ 9; Dep. Mangus, p. 201, 202) This project required a developer to write instructions, known as "code," for a program. (Aff. Schulz, ¶ 9) Code for this project was written before the design and requirements for the project were completed. (Dep. Mangus, p. 203) This resulted in a rework and increased the project's cost. (Dep. Mangus, p. 203)

Schulz met with Mangus on December 5, 2002, to discuss this project and Magnus referred to it as "a runaway project." (Dep. Mangus, pp. 204, 205; Aff. Schulz, ¶ 9) Schulz asked Mangus to get control of the project's ideas so that the plan could be

11

completed and approved on the project. (Dep. Mangus, p. 205; Aff. Schulz, ¶9) Mangus agreed that this project would use the correct methodology by December 13. (Aff. Schulz, ¶ 9)

On December 17, 2002, Mangus provided Schulz with her milestones for getting the project back on track, a rework impact assessment, and a deadline for the project. (Dep. Mangus, p. 206; Aff. Schulz, ¶ 9) However, the project was put on hold in January of 2003. (Dep. Mangus, p. 209) Schulz's concerns with the project included Mangus' failure to obtain a clear requirement from internal customers, her failure to develop a methodology to resolve the issues, the writing of code before the project was defined clearly, and his perception that the team was not clear on the project's purpose. (Aff. Schulz, ¶ 9)

In January of 2003, Schulz was informed that Mangus repeatedly missed the 2:00 p.m. change meeting required of Project Managers. (Dep. Mangus, p. 200, Ex. 1024) Mangus acknowledges possibly missing one or more meetings that she needed to attend regarding projects that she was leading. (Dep. Mangus, pp. 199-201)

Additionally, Mangus worked on the DI Data Security Project for Metavante's client Digital Insight to protect against certain security vulnerabilities. (Dep. Mangus, pp. 214 -216) This project consisted of two phases, with the first completed in 2002. (Dep. Mangus, pp. 214-215) In May of 2002, Mangus' team installed the program on Metavante's computers. (Dep. Mangus, p. 216) This install addressed certain vulnerabilities; however, to address all vulnerabilities Schulz concluded Digital Insight also needed to perform work on its computers. (Aff. Schulz, ¶ 10) Although Mangus pushed out the code to Digital Insight's computers, it was never installed. (Dep. Mangus, p. 216)

12

Hammer believed that Mangus failed to work with Digital Insight to address its changes because she believed erroneously that it was the customer's problem, not Metavante's. (Aff. Hammer, ¶ 4)  As a consequence, Schulz informed Mangus that she needed to take better notes.  (Dep. Mangus, pp. 216-17; Aff. Schulz, ¶ 10)

The second part of the Digital Insight project was scheduled for installation in January of 2003.  (Dep. Mangus, pp. 217, 220; Aff. Schulz, ¶ 10)  However, installation was delayed until February 19, 2003, and later delayed until March.  (Dep. Mangus, pp. 217-18)

Hammer informed Schulz that she was upset by this delay and could not understand why it was delayed so long.  (Aff. Hammer ¶ 4; Aff. Schulz, ¶ 10; Dep. Mangus, p. 218)  When Schulz spoke with Mangus about the delay, she related that she had been told it could not go in the weekend of February 23, 2003, because of a resource shortage. (Aff. Schulz, ¶ 10)  Mangus then stated that she decided to implement the project during a PACE weekend based on management issues.  (Dep. Mangus, pp. 218, Ex. 1029; Aff. Schulz, ¶ 10)  Later that day, it was determined that the project could be installed on the weekend of February 23, 2003.  (Aff. Schulz, ¶ 10)

Schulz spoke with Mangus about the need for her to update her milestones. (Dep. Mangus, p. 219)  Schulz "always" spoke about this.  (Dep. Mangus, p. 219)  In addition, Schulz spoke with Mangus about the need for her to update the project plan because he discovered that following the January delay, she had not updated the plan to reflect the new February dates.  (Dep. Mangus, p. 220, Ex. 1030)  On February 20, 2003, Hammer expressed to Schulz concern that proper communication may not have occurred with Digital Insight regarding the install.  (Aff. Hammer, ¶ 4; Aff. Schulz, ¶ 10)

13

On February 23, 2003, this project was installed partially. (Dep. Mangus, p. 226) During this install an issue occurred about resetting passwords. (Dep. Mangus, pp. 226-227) This issue came to light the next day, Monday, February 24, 2003. (Dep. Mangus, p. 227) However, Mangus was at a doctor's appointment, and had not spoken with anyone to act as a backup because she "did not know there was going to be an issue with the passwords." (Dep. Mangus, p. 227) Mangus acknowledges that she was not reachable when the password issue arose. (Dep. Mangus, p. 227)

At the time of the install, Jo Militello, Quality Assurance Manager for Electronic Payments, contends that she told Mangus that she never received information that an extended outage would occur during the installation of this project whereas Mangus maintains that she sent it out. (Dep. pp. 220-21, Ex. 1031) In addition, Hammer spoke with Schulz about these issues. (Aff. Hammer, ¶ 4) Schulz believed that Mangus should have arranged for a backup and her failure to do so resulted in delays in addressing the situation. (Aff. Schulz, ¶ 18)

Finally, from January 7, 2003, Mangus worked on the CSP Job Automation project, which was supposed to be completed by mid-March. (Dep. Mangus, pp. 221-222) This job involved identifying manual jobs at the San Jose, Cyberbills, facility, which had been acquired by Metavante. (Dep. Mangus, p. 221) As part of this project, Mangus was to determine which jobs were still needed, organize them, and then automate them and get them onto a schedule. (Dep. Mangus, pp. 221-22)

From the start, Schulz stressed the need for Mangus to work with customers and her stakeholder as part of this project and to define success criteria for the project so that upon completion she and the customer were measuring the project's success in the

14

same manner. (Dep. Mangus, p. 222; Aff. Schulz, ¶ 11) However, in late January of 2003, Magnus asked Schulz for help in clarifying to certain employees that she was working remotely. (Dep. Mangus, pp. 210-211, Ex. 1028)

During this project, the developer resigned and Josh Tran remained as the only developer. (Dep. Mangus, pp. 222-223) As a result, the project's scope was reduced to whatever could be completed by early March. (Aff. Schulz, ¶ 11)

Schulz directed Mangus to meet with her stakeholder, Todd Schneider, and to establish scope and success criteria for the revised project. (Dep. Mangus, p. 223; Aff. Schulz, ¶ 11) On February 7, 2003, Schulz e-mailed Mangus after reviewing information she had provided and realizing an error that she made by switching two numbers. (Dep. Mangus, p. 224, Ex. 1035) Schulz explained that it was important that Mangus keep details straight to reduce the chance of confusion because a number of communication challenges with the San Jose facility. (Dep. Mangus, p. 224, Ex. 1035)

On February 18, 2003, Kathleen Latzke-Daley, the Resource Manager who supervised Tran, talked with Schulz about her concerns with the project. (Aff. Schultz, ¶ 12) This raised additional concerns on Schulz's part regarding Mangus' management of this project and others. (Aff. Schulz, ¶ 12) Latzke-Daley told Schulz she:

> a.    Had been working with Tran on improving communication techniques and had him copy her on emails he sent to Mangus as part of this coaching;
>
> b.    Had asked Tran to provide her with a list of project milestones, to which he replied that he did not know what they were;
>
> c.    Had looked in the project folder for the plan or milestones and could not find more than a small project

overview document and the only list of milestones had January dates on it; and

> d.  Had asked Mangus for the plan, and in response Mangus sent her the same list she had sent Hammer earlier.

(Aff. Schulz, ¶ 12)  Finally, Latzke-Daley expressed concern to Schulz that the project plan dates were not current, and that some did not make sense.  (Aff. Schulz, ¶ 12)  Schulz explained to Latzke-Daley that if a milestone list was being used, the project plan may only be for time reporting purposes.  (Aff. Schulz, ¶ 12)  Latzke-Daley, however, stressed that she was concerned that team members did not have a documented time line they were working towards from the beginning of the project.  (Aff. Schulz, ¶ 12)

Latzke-Daley also noted that inconsistencies were being communicated: when Tran went to the stakeholder, the stakeholder said the code did not need to be completed by the milestones that Mangus had provided.  (Aff. Schulz, ¶ 12)  Latzke-Daley told Schulz that this led Tran to question Mangus about how important his meeting the milestones were, and her response that it was not critical that he hit them.  (Aff. Schulz, ¶ 12)  Additionally, Latzke-Daley stated she did not believe that Tran knew the documentation requirements for installing his changes until he was almost ready to install. (Aff. Schulz, ¶ 12)  Based on her observations, Latzke-Daley believed that the project was in "red" status.  (Aff. Schulz, ¶ 12)  "Red" status meant the project had known issues with no action plan for resolution identified.  (Aff. Schulz, ¶ 12)  Latzke-Daley's comments concerned Schulz.  (Aff. Schulz, ¶ 12)

On February 24, 2003, Latzke-Daley e-mailed Schulz regarding a conversation with Mangus about the project plan.  Mangus had stated that she had encountered a problem with the project file, that the new file may not have all original tasks

16

and items that she planned, that team members would not have seen this plan because she preferred to give them a list of tasks, and that she did not need a full-blown project plan. (Dep. Mangus, p. 230, Ex. 1037) At that time, Latzke-Daley questioned Mangus' statement regarding the distribution of a list of tasks to team members because Tran did not have such a list until Latzke-Daley required him to request such a list from Mangus in early February. (Ex. 1037)

On March 10, 2003, Schulz asked Mangus if she had notified Hammer that the installation of the CSP project had been delayed to March 21. (Dep. Mangus, p. 229; Aff. Schulz, ¶ 23) When Schulz spoke with Hammer about the delay, she said that she thought the project had been completed because the most current status report and the weekly status report had milestones in the past. (Aff. Schulz, ¶ 23) The CSP project had not been completed when it was cancelled in May of 2003, because another project negated it. (Dep. Mangus, p. 231; Aff. Schulz, ¶ 23)

On February 26, 2003, Schulz learned that the paperwork for the FTC project had not been completed, requiring Mangus to reopen it to make a change to the work category. (Dep. Mangus, pp. 241-242, 326, Exs. 1049, 1071) In addition, Mangus' husband continued to answer the telephone line Metavante paid for as a business line. (Dep. Mangus, p. 160; Aff. Schulz, ¶¶ 7, 21) Mangus acknowledges that Schulz expressed concern about individuals not contacting Mangus because of her remoteness. (Dep. Mangus, pp. 169-170) Schulz believed these issues reflected further problems with Mangus' telecommuting arrangement. (Aff. Schulz, ¶ 21)

In February of 2003, Schulz learned he would be reporting to Hammer the following month. (Dep. Mangus, pp. 109-10; Aff. Schulz, ¶ 13) Schulz began to assess

17

the Telecommuting Agreement in light of Hammer's concerns regarding it, the issues he had observed with it and problems with Mangus' projects following her removal from the Performance Action Plan. (Aff. Schulz, ¶ 13) When he began to assess this arrangement, Schulz only knew that Mangus had injured her knee in October resulting in a trip to the emergency room and the need to be off work one day. (Aff. Schulz, ¶ 13) Schulz had not observed any physical limitations caused by Mangus' knee injury; she had not informed him of any physical limitations she suffered because of her knee, and had not requested any work accommodations because of the knee injury. (Aff. Schulz, ¶ 13) Indeed, Mangus had not provided Schulz with any medical documentation showing the injury limited her in any way. (Aff. Schulz, ¶ 13) Schulz had required Mangus to use vacation time or lunch time to attend appointments. (Dep. Mangus, pp. 75-76; Aff. Mangus, ¶ 6)

On February 18, 2003, Schulz informed Hammer that he was considering revoking the Telecommuting Agreement due to poor performance. (Aff. Schulz, ¶ 14) Hammer agreed that Mangus' performance was lacking and that it was time to revoke the Agreement. (Aff. Schulz, ¶ 14; Aff. Hammer, ¶ 5) However, he believed that the Agreement should have been revoked months earlier. (Aff. Hammer, ¶ 5)

Hammer had planned to revoke Mangus' Agreement as soon as she became responsible for Schulz's area because she believed that Mangus had not adequately performed. (Aff. Hammer, ¶ 5) In particular, Hammer believed Mangus had mismanaged projects and had not managed her project plans properly. (Aff. Hammer, ¶ 5) While the FTC project had been a success, Hammer was of the view that Mangus' plan for the project lacked detail and that the project was only successful because of the quality members on the team. (Aff. Hammer, ¶ 6) Hammer also had difficulties locating Mangus

18

at times because she would not answer the phone or respond to pages. (Aff. Hammer, ¶ 6) Finally, Hammer believed that Mangus' professionalism at home was lacking. (Aff. Hammer, ¶ 6) For instance, Mangus' dogs would bark during telephone conferences and her husband would answer the business line. (Aff. Hammer, ¶ 6)

Hammer made the decision to revoke Mangus' Agreement before she knew of any issues involving Mangus' knee. (Aff. Hammer, ¶ 7) Although at some point Hammer was aware that Mangus needed surgery, she had no knowledge regarding the extent of the knee injury, Mangus' diagnosis of osteoarthritis, or any limitations the injury caused. (Aff. Hammer, ¶ 7) While Hammer wanted Mangus to return to Milwaukee, she did not want Mangus to leave Metavante. (Aff. Hammer, ¶ 8) Hammer's Department was subject to a hiring freeze and she needed people to perform the projects assigned to it. (Aff. Hammer, ¶ 8)

On February 19, 2003, Schulz contacted Paul Cooke in Human Resources to speak with him about revoking the Agreement. (Aff. Schulz, ¶ 15; Aff. Cooke, ¶ 2-3) Cooke suggested that, while the Agreement only required two-weeks notice, Schulz provide Mangus with 30 days to return to Milwaukee. (Aff. Schulz, ¶ 15; Aff. Cooke, ¶ 3)

On February 20, 2003, Schulz held his weekly one-on-one meeting with Mangus. (Aff. Schulz, ¶ 16) Schulz told Mangus about the concerns Latzke-Daley had raised about CSP Job Automation. (Aff. Schulz, ¶ 16) Mangus does not recall speaking with Schulz "one-on-one," but stated that this project was "green," which meant it was on schedule with no outstanding issues. (Aff. Schulz, ¶ 16) Schulz asked Mangus to speak with Tran and Latzke-Daly to obtain their viewpoints of the project's status. (Aff. Schulz, ¶ 16) Schulz told Mangus he was concerned the remote arrangement may not be working

because communication breakdowns were increasing and that he was debating whether this was a performance or remoteness issue. (Dep. Mangus, pp. 231-232; Aff. Schulz, ¶ 16) Schulz told Mangus that she needed to be a better listener and she needed to over communicate to compensate for not seeing her audience's body language. (Aff. Schulz, ¶ 16) Mangus did not think that her remoteness was causing these issues, but agreed to think about it. (Aff. Schulz, ¶ 16)

Despite Schulz's informing Mangus that it was critical that she establish deadlines and milestones for the CSP Job Automation project, on February 20, 2003, she forwarded to him an incomplete milestone list. (Dep. Mangus, p. 225, Ex. 1036) In particular, this list failed to include any deadlines for the jobs associated with the CSP Job Automation project, despite the fact that Mangus had received the project in early January and it was scheduled to be concluded in a matter of weeks. (Ex. 1036) Schulz informed Mangus that this document was not considered "milestones" because it contained no dates. (Ex. 1036; Aff. Schulz, ¶ 17) In addition, Mangus told Schulz that Josh Tran agreed with her that the project's status was yellow, but she had previously told Schulz the status was green. (Dep. Mangus, pp. 228-229, Ex. 1036; Aff. Schulz, ¶ 17)

At a meeting on February 24, 2003, with team members, Mangus discussed the issues that had arisen with the Data Security install the prior day and the status of the CSP project. (Aff. Schulz, ¶ 18) Hammer and Schulz did not agree that the problem with the password on the Data Security install was one that could wait, as Mangus had decided. (Aff. Schulz, ¶ 18) Also, Schulz believed that Mangus' review of the CSP project at the meeting left the audience confused and concerned because the project was two weeks away from completion. (Aff. Schulz, ¶ 18)

On February 26, 2003, Schulz mentioned to Grimm that he was considering revoking the Telecommuting Agreement. (Aff. Schulz, ¶ 20) Grimm told Schulz he supported this decision. (Aff. Schulz, ¶ 20)

On March 4, 2003, Schulz met with his supervisor, Keyes, to share his concerns regarding Mangus and his recommendation that the Agreement be revoked. (Aff. Schulz, ¶ 22) Keyes agreed with Schultz' recommendation to revoke the Agreement and suggested that Schulz address Mangus' performance issues with a Performance Action Plan. (Aff. Schulz, ¶ 22)

On March 13, 2003, Schulz and Cooke informed Mangus by telephone that the Telecommuting Agreement was being revoked. (Dep. Mangus, p. 255-256) Schulz believed Mangus was having difficulty with project control in that she was not setting clear expectations, providing clear scope and success criteria and using proven practices throughout the entire projects for which she was responsible. (Aff. Schulz, ¶ 24) In addition, Schulz was of the opinion that Mangus was not documenting project plans appropriately, and was not understanding and communicating constraints and dependencies which affected her ability to perform to expectations. (Aff. Schulz, ¶ 24) Schulz anticipated that future projects were going to require one-on-one interaction that could not be performed by Mangus if she worked remotely. (Aff. Schulz, ¶ 24)

Schulz documented discontinuation of the arrangement in a memorandum. (Dep. Mangus, p. 256, Ex. 1052) The memorandum explained to Mangus that over the last year Schultz had observed a deterioration and lack of consistency in her performance noting: Mangus' failure to have a consistently clear understanding of her team's progress and plan; and that her last three projects (Data Mining, DI Data Security and CSP Job

21

Automation) did not reflect the quality expected of her position.  (Ex. 1052)  Schulz noted

that, while Data Mining had been put on hold for business reasons, prior to this occurring,

Mangus did not have control of the project because very little project methodology was

followed; DI Data Security had issues that impacted internal and external customers; and

the CSP Job Automation project lacked structure, milestones and control.  (Ex. 1052)

Mangus acknowledges that some of her projects had issues. (Dep. Mangus, p. 123)

Schulz informed Mangus that she had 30 days to return to Milwaukee and

that she was free to pursue other positions at Metavante that would allow her to maintain

her remote working arrangement.  (Ex. 1052)  In addition, Schulz placed Mangus on a

Performance Action Plan.  (Dep. Mangus, p. 260, Ex. 1053)  The Plan stated:

> Carol will work with her peers, mentors, and her supervisor to
> strengthen her project management control and planning skills.
> Carol needs to use tools and techniques to demonstrate that
> she is in complete control of her project from project initiation
> to project close out.  She needs to drive more detail into her
> plans when working with her team members, stakeholders, and
> customers.  Carol needs to meet with her stakeholders and/or
> customer frequently to make sure the scope and criteria is
> clearly documented and understood.  Effective tracking and
> change management will allow Carol to see when the project
> team is off course and help the team understand the plan to
> get back on course.  Well-defined and communicated detailed
> milestones (with their corresponding constraints and
> dependencies) will provide Carol the proper tools for her to
> monitor and track.  Carol needs to continually demonstrate that
> she understands the project methodology and demonstrate
> that she can lead her teams in the proper application of it.

(Ex. 1053)

Schulz believed Mangus' performance would improve if she returned to

Milwaukee.  (Dep. Mangus, p. 258; Aff. ¶ 24) On the other hand, Mangus believes that

Schulz discontinued the program because he wanted her back in Milwaukee, people were

unable to stop at her desk to interact with her and to solve Schultz' mess. (Dep. Mangus, pp. 257-258, 264)

After Schulz revoked Mangus' Telecommuting Agreement, he nominated the FTC Team for the"Ovation Award," given by Metavante once a year. (Dep. Mangus, p. 181; Aff. Schulz, ¶ 27) The purpose of this Award is to recognize a project that most achieved the mission statements of the Company in the previous year. (Dep. Mangus, p. 181) This Award does not recognize project management skills. (Dep. Mangus, p. 181) Schulz nominated the team because it had done a great job on the project, Mangus' performance during the time of the project had been acceptable and she had been removed from the Performance Action Plan. (Aff. Schultz ¶ 27) Moreover, Schulz did not believe the team should be punished for Mangus' performance in 2003 by not being nominated for the Award. (Aff. Schulz, ¶ 27) The team won the Award, to Mangus' surprise. (Dep. Mangus, p. 81) This Award recognized the entire FTC team. (Dep. Mangus, p. 181) However, after completion of the project Mangus' performance began to deteriorate. (Aff. Schultz ¶ 27)

Mangus spoke with Richard Derksen, Manager of Employee Relations, about the discontinuation of the Agreement on March 13, 2003. (Dep. Mangus, p. 264; Aff. Cooke, ¶ 8) She mentioned problems with her knee and financial issues, which she said prevented her from coming back to Milwaukee. (Dep. Mangus, pp. 264-65) Afterward, Derksen gave Mangus an extension until June 13, 2003, to return to Milwaukee. (Dep. Mangus, p. 265)

On March 21 or 27, 2003, Mangus told Derksen that her doctor had determined that she could not move to Milwaukee for a minimum of an additional six

months.  (Dep. Mangus, p. 265, Ex. 1054)  Derksen sent Mangus a letter documenting their conversation, including that Mangus should return to Milwaukee or resign.  (Ex. 1054) Mangus then provided a letter from Dr. William Walsh stating that Mangus had been under his care, had undergone arthroscopic surgery approximately one month prior, and that she was having arthritic symptoms following the surgery.  (Dep. Mangus, p. 190, Ex. 1019) This letter added:

> The patient indicates that she has been asked to move to the
> Milwaukee area.  It is my medical opinion that this patient's
> knee would not tolerate the rigors of packing her household
> and moving her goods at this time.  This restriction is in effect
> for an indefinite period of time.  As an estimate I would say that
> this will be true for approximately the next six months or so.

(Dep. Mangus, p. 190, Ex. 1019)  According to Dr. Walsh, packing and moving would "likely" aggravate Mangus' condition creating more pain and swelling in her knee.  (Dep. Walsh, p. 73 [Aff. Ploor, Ex. D])

In his letter, Derksen explained to Mangus that, while he understood that she was asking for an accommodation, Metavante was only required to provide a reasonable accommodation so that she could perform the essential functions of her job, with or without reasonable accommodation; not to accommodate her ability to get to and from work.  (Ex. 1056)  Derksen informed Mangus that her request for an additional six months to begin working in Milwaukee was denied.  (Ex. 1056)

On April 29, 2003, Mangus' attorney requested that she once again be allowed to work from her home in Iowa, "until she can physically make the move to Milwaukee" or that  Metavante transfer Mangus to a department where employees are allowed to work from their homes.  (Dep. Mangus, p. 268; Ex. 1057)

24

Magnus flew from Omaha to Milwaukee when her team received the Ovation Award for the FTC project at a ceremony in Milwaukee on May 8, 2003. (Dep. Mangus, p. 182) Mangus flew in and returned to Omaha on the same day, used a cane for the trip, and did not have any luggage. (Dep. Mangus, p. 183) According to Mangus, the trip was exhausting, and her husband avers that "she was in pain and her leg was extremely swollen." (Dep. Mangus, pp. 183-184; Aff. Holliday, ¶ 11) She worked part of the next day, but testified that it took three days to recover. (Dep. Mangus, p. 183)

Mangus felt, that while she could return to Metavante for the Award, she could not do the same to return to work full-time in Milwaukee because she could not afford it, she could not pack and move, and she could not afford to move herself. (Dep. Mangus, p. 185).

On May 12, 2003, Derksen informed Mangus and her counsel that Metavante had no obligation to accommodate Mangus' request because the ADA did not require it to accommodate her choice of moving arrangements. (Dep. Mangus, p. 270, Ex. 1059) Metavante has never paid for anyone else to return to Milwaukee after the revocation of a telecommuting arrangement. (Aff. Cooke, ¶ 5)

On May 15, 2003, Schulz received an e-mail from Gail VanderVest complaining about Mangus' lack of responsiveness and failure to appropriately communicate regarding the Total Field Expansion project on which Mangus was working. (Dep. Mangus, p. 236, Ex. 1039) Previously, Mangus informed Schulz that this project was on schedule. (Dep. Mangus, p. 236) Upon receiving this e-mail, Schulz asked Mangus what she was working on and to contact VanderVest immediately. (Dep. Mangus, pp. 236-37, Ex. 1040) Schulz e-mailed Mangus that day and told her that the problems

VanderVest expressed in her e-mail were an example of a project which is not under control and lack of communication because Mangus was not in Milwaukee. (Dep. Mangus, p. 237, Ex. 1041) In subsequent e-mails, Mangus admitted that she was not aware of certain issues with the project and that she had the mistaken "impression" that VanderVest was organized and had things under control. (Dep. Mangus, p. 238, Ex. 1042)

This confirmed Schulz's concern that there were communication issues because of Mangus' remote location. (Aff. Schulz, ¶ 26) Mangus' subsequent communication with VanderVest and VanderVest's response further highlighted the communication problems that Mangus was having while performing remotely. (Dep. Mangus, p. 238, Ex. 1043)

After Mangus' Telecommuting Agreement was revoked, she applied for three other jobs at Metavante: Banking Business Consultant I, Banking Business Consultant Specialist and Conversion Manager. (Dep. Mangus, pp. 273, 282) However, she did not seek Human Resources' help while seeking another job at Metavante. (Dep. Mangus, p. 286)

Mangus applied for the Banking Business Consultant I position in March 2003. (Aff. Cooke, ¶ 6) The job description required 50% travel. (Dep. Mangus, p. 272, Ex. 1061) Mangus was not able to travel that much, and from the time that she applied for the job until her employment ended on June 13, 2003, she would not have been able to regularly engage in business travel. (Dep. Mangus, p. 274) Ann Schneider, the hiring manager for the position, hired Thomas Bolger because she believed Bolger had more of the skills that she needed for this position and, thus, was better qualified. (Aff. Schneider, ¶¶ 2-3) In particular, this position required experience with financial technical solutions,

26

disaster recovery, and banks – experience which Bolger already possessed. (Aff. Schneider, ¶ 3) Schneider spoke with Mangus about this position and believed that Mangus did not have as much experience with banking institutions as Bolger. (Aff. Schneider, ¶ 3) In this position, Bolger travels approximately three weeks per month. (Aff. Schneider, ¶ 3) Schulz never spoke with Schneider about this position or Mangus' interest in it. (Aff. Schulz, ¶ 28; Aff. Schneider, ¶ 4) Moreover, Mangus has no knowledge that she was not hired for this position because of her age, knee or sex. (Dep. Mangus, p. 278)

The grade 26 Banking Business Consultant Specialist job that Mangus applied for was higher than her classification at the time. (Dep. Mangus, pp. 278-279; Aff. Cooke, ¶ 6) The job description indicates 25% travel. (Dep. Mangus, p. 278, Ex. 1062) The recruiter for the position, Alison Neuman, forwarded Mangus' resume to Scott Morgano, the hiring manager. (Aff. Morgano, ¶ 3) Morgano did not select Mangus for an interview because he did not believe that she had necessary skills, in particular sales experience, that was required for successful performance of this position. (Aff. Morgano, ¶ 3) Jeff Truman, a male with no disabilities, also applied for this job. (Aff. Morgano, ¶ 4) Truman was searching for a job because his position was being eliminated. (Aff. Cooke, ¶ 6; Aff. Morgano, ¶ 4) However, Morgano did not hire Truman because he did not believe he was qualified for the position. (Aff. Morgano, ¶ 4)

The position remained open until 2004 when David Burg was hired. (Aff. Morgano, ¶¶ 5, 6) Burg had worked in the same position when he was employed by Metavante's competitor. (Aff. Morgano, ¶ 5) He travels approximately two to three days per week. (Aff. Morgano, ¶ 5) Schulz did not contact Neuman or Morgano regarding this position or Mangus' interest in it. (Aff. Schulz, ¶ 28; Aff. Morgano, ¶ 6) And, Mangus has

27

no evidence that she was not hired for this position because of her knee, sex, or age. (Dep. Mangus, p. 281)

Finally, Mangus applied for the Conversion Project Manager position on June 6, 2003. (Dep. Mangus, p. 282, Ex. 1063)  Maria Richson, who referred Mangus to Metavante, was the hiring manager for this position.  (Dep. Mangus, p. 282)  Richson told Mangus that this posting had been created for a particular individual, John Gurevitch at the New Jersey office, but that if he did not want the position, Richson would consider Mangus for it. (Dep. Mangus, pp. 282, 284; Aff. Cooke, ¶ 6)  Gurevitch accepted the position.  (Aff. Cooke, ¶ 6) Mangus acknowledges that Richson did not discriminate against her based on her knee, sex or age when she did not hire her for this position.  (Dep. Mangus, p. 284) Schulz did not speak with Richson about this position or Mangus' interest in it.  (Aff. Schulz, ¶ 28)

Mangus' employment with Metavante ended on June 13, 2003, when she had not found any other work at Metavante and refused to return to Milwaukee.  (Aff. Cooke, ¶ 7)  Metavante coded Mangus' separation as a termination. (Aff. Cooke, ¶ 7)  It did so in response to Mangus' objections to her separation being coded as anything other than a termination.  (Aff. Cooke, ¶ 7)

If Mangus had returned to Milwaukee, she would have remained a Project Manager with the same compensation and benefits she enjoyed while working in Iowa. (Aff. Schulz, ¶ 24)  Following her departure, Metavante did not hire anyone to replace Mangus, although Todd Schneider "moved into the Project Manager role in July of 2003. (Aff. Hammer, ¶ 8)  The Department had a hiring freeze, and Schneider did not express an interest in this role until after Mangus left Metavante.  (Aff. Hammer, ¶ 8)  When Schulz

28

was considering revoking the Telecommuting Agreement he was unaware that Schneider, his peer, was interested in moving to another position. (Aff. Schulz, ¶ 29) Moreover, when Schneider moved into this role, Metavante had not hired anyone to replace other employees, such as Sue Morgano, who left the Department before Mangus. (Aff. Hammer, ¶ 8)

Mangus' knee injury dates back to October 2002, when it "went out" while helping a friend. (Dep. Mangus, pp. 27, 67) When the injury occurred, she was in a great deal of pain the rest of the day and night. (Dep. Mangus, pp. 28, 67; Aff. Holliday, ¶ 5) The next day, Mangus' knee went out again and she had to be helped to the car and taken to the hospital. (Dep. Mangus, pp. 28, 68) The doctors did not see any acute abnormality with the knee. (Dep. Mangus, p. 68) However, Mangus took a day or two off from work. (Dep. Mangus, pp. 28-29) Before doing so, she told Schulz that she had hurt her knee and would be off work. (Dep. Mangus, p. 29)

Mangus saw Dr. Curtis Hansen at Miller Orthopedics following the accident, and received a cortisone shot. (Dep. Mangus, pp. 68-69) She was told that she might need a knee replacement. (Dep. Mangus, p. 69) Although Mangus contends that Dr. Hansen diagnosed her with osteoarthritis in the left knee, his records state he did not find any severe arthritis upon examining Mangus. (Dep. Mangus, p. 70; Aff. Ploor, Ex. C) Mangus saw Dr. Hansen a few more times following her initial visit. (Dep. Mangus, p. 70) However, she did not like Dr. Hansen's diagnosis, and left his care to see Dr. Walsh on January 27, 2003. (Dep. Mangus, pp. 70, 72) Dr. Walsh recommended that Mangus' knee be treated conservatively. (Dep. Mangus, pp. 72-73) Thus, Dr. Walsh added physical

therapy to Mangus' treatment and mentioned the possibility of scoping her knee. (Dep. Mangus, p. 74)

Mangus next saw Dr. Walsh on February 24, 2003. (Dep. Mangus, pp. 74-75) This was after Schulz began considering revocation of the Telecommuting Agreement and after Hammer had told him the agreement should be revoked. (Aff. Schulz, ¶ 14; Aff. Hammer, ¶ 5) Mangus indicated to Dr. Walsh on the February 24 visit that she still had pain and swelling, but her motion was better. (Dep. Mangus, p. 77) At the conclusion of this visit, Mangus decided to utilize a cortisone injection and to schedule arthroscopic surgery for her knee. (Dep. Mangus, pp. 77-78)

On March 7, 2003, Mangus had arthroscopic surgery on her knee. (Dep. Mangus, pp. 11, 78) Schulz had similar surgery and did not think it was a major medical problem given his experience, his short recovery period, and Mangus' request for one day off of work for the surgery. (Aff. Schulz, ¶ 30) Mangus informed Schulz that she would provide him with certain information regarding a project the day before the surgery. (Dep. Mangus, p. 241, Ex. 1048) She did not. (Ex. 1048)

Mangus was off work one day because of the surgery and saw Dr. Walsh a week later. (Dep. Mangus, pp. 79-80) At that time, she told Dr. Walsh her pain was under control. (Dep. Mangus, p. 80)

On March 26, 2003, Mangus told Schulz that she had stage 3 and 4 arthritis. (Dep. Mangus, p. 243, Ex. 1050) However, she never told Hammer or Keyes she had arthritis. (Dep. Mangus, p. 244)

Mangus next saw Dr. Walsh a month later on April 4, 2003. (Dep. Mangus, pp. 80-81) On this visit, Mangus advised Dr. Walsh that the pain was not much better and

30

that the knee was giving out on her. (Dep. Mangus, p. 81) Dr. Walsh stated that he believed Mangus had osteoarthritis. (Dep. Mangus, p. 81) On this date, he provided Mangus with a letter stating that she had been under his care, she had undergone arthroscopic surgery approximately one month prior, and that she was having arthritic symptoms following the surgery. (Dep. Mangus, p. 190, Ex. 1019) This letter also stated:

> The patient indicates that she has been asked to move to the Milwaukee area. It is my medical opinion that this patient's knee would not tolerate the rigors of packing her household and moving her goods at this time. This restriction is in effect for an indefinite period of time. As an estimate I would say that this will be true for approximately the next six months or so.

(Ex. 1019)

Mangus next saw Dr. Walsh in May of 2003 regarding her knee, but did not see him after this. (Dep. Walsh, p. 56, 64) Mangus also saw Dr. Palmer regarding her knee on June 30, 2003. (Dep. Mangus, p. 84) Dr. Palmer recommended an injection treatment, but Mangus declined. (Dep. Mangus, p. 85) Initially, Mangus attributed her failure to have the injection to a lack of health insurance and acknowledges that she did not seek treatment from Dr. Palmer after obtaining health coverage from a new employer. (Dep. Mangus, pp. 85-86)

Since June of 2003, Mangus' treatment has consisted of going to her primary doctor, Dr. Zimmer, three times to obtain treatment on other concerns. (Dep. Mangus, p. 86) These occasions consisted of a migraine attack, the shakes and problems relating to edema in her left leg. (Dep. Mangus, pp. 87-89, 25, 31-32) Mangus has not seen any other doctors for her knee since leaving Metavante in June of 2003 even though she has had health insurance since December of 2003. (Dep. Mangus, pp. 85, 89)

Mangus asserts that she is disabled because of osteoarthritis in her left knee. (Dep. Mangus, p. 25) Dr. Walsh has testified that in his opinion Mangus suffers from serious arthritis – inflammation of a joint, in her left knee, when he treated her from January to May 2003. (Dep. Walsh, pp. 65-66) According to Mangus, this condition limits her major life activities of "walking, lifting, stooping and kneeling." (Dep. Mangus, p. 271, Ex. 1060)

Following the surgery in March of 2003, Mangus' doctor told her that she should limit kneeling. (Dep. Mangus, p. 48) Mangus was able to perform her job at Metavante from October of 2002 through June of 2003. (Dep. Mangus, p. 30) With regard to her knee, Mangus "frequently" elevated it when at her desk. (Dep. Mangus, pp. 31, 50) Her husband avers that Mangus spent 99 percent of her time sitting and kept her leg elevated when she was sitting. (Aff. Holliday, ¶ 8) Mangus was prescribed a compression stocking to alleviate this swelling. (Dep. Mangus, p. 32) While Mangus wore this stocking for a couple of months in early 2003, now, she uses it only on an as-needed basis. (Dep. Mangus, p. 33)

In his affidavit, Mangus' husband states that Mangus avoided walking and standing because it was painful to do so for more than five or ten minutes. (Aff. Holliday, ¶ 8(a)) He also states that when Mangus stood she would put her weight on her good leg. (Aff. Holliday, ¶ 8(c)) Mangus testified that from October of 2002 though June of 2003 she could walk distances, but it was painful and tiring. (Dep. Mangus, p. 41)

From October 2002 through June 2003, Mangus could not: walk great distances, lift heavy weight, negotiate stairs, kneel, climb a ladder, bend, stoop, pick fruit from trees or garden. (Dep. Mangus, pp. 30, 33-34, 41) Mangus did not identify any other

32

activities with which she had issues. (Dep. Mangus, p. 41) However, she was able to care for herself, type, play cards, write by hand, answer the phone, watch and operate a television, walk, see, hear, speak, breathe, learn, think, analyze, communicate, clean herself, eat, perform household chores, read, attend auctions, and go antiquing. (Dep. Mangus, pp. 37, 38-40)

Mangus does not believe that she would have been able to travel from October of 2002 through June of 2003 or after this time period. (Dep. Mangus, pp. 36-37) Her doctor, however, testified that she was capable of getting on and off an airplane. (Dep. Walsh, p. 59).

Mangus never obtained a disabled parking permit. (Dep. Mangus, p. 37) However, her limitation prevented her from lifting anything over ten pounds. (Dep. Mangus, p. 42; Aff. Holliday, ¶ 8(m)) This prevented Mangus from lifting her dogs and a 50-pound bag of dog food. (Dep. Mangus, p. 43) On the other hand, she could bend to get items off the floor but not anything heavy. (Aff. Holliday, ¶ 8(m))

Mangus had difficulty negotiating stairs, but was able to walk up and down her stairs to go to bed on the second floor at night. (Dep. Mangus, pp. 43-44; Aff. Holliday, ¶ 8(d)) When climbing stairs, Mangus would simply hold on to the handrails. (Dep. Mangus, p. 44) She used the stairs only to go to bed at night and to come down in the morning. (Dep. Mangus, pp. 43-44; Aff. Holliday, ¶ 8(d)) When Mangus went up the stairs she would lead with her good leg and bring her bad leg up so that she could keep her bad leg straight to put less strained on the left knee. (Aff. Holliday, ¶ 8(d)) Similarly, when she came down the stairs she would lead with her bad leg and bring the good leg up so that she could keep the bad leg straight. (Aff. Holliday, ¶ 8(d)) Mangus' husband walked

33

behind her when she went up the stairs and in front of her when she went down the stairs because he was afraid she would fall. (Aff. Holliday, ¶ 8(d))

In addition, from October of 2002 through June of 2003, Mangus learned to use a mop to clean her floors, and her husband helped with the housework. (Dep. Mangus, p. 49) Mangus testified that she could not load and unload the groceries, clean the bathroom or clean the tub during this period. (Dep. Mangus, pp. 49, 55) However, her husband states in his affidavit that he "cleaned the things that would require her to kneel, stoop/squat, get on a ladder to reach, go up and down the stairs, or required standing or walking": he vacuumed, cleaned the tub and toilet, brought dirty clothes from the bedroom, took the clean laundry back to the bedroom, removed the clothes from the dryer, ironed, stripped the linens off the beds or replaced the bed linens after they were washed, shopped for more than just a few minutes, loaded groceries into the car, and unloaded the groceries from the car. (Aff. Holliday, ¶ 8) Mangus was able to paint as she sat in a chair, and her husband painted the areas she could not reach. (Aff. Holliday, ¶ 8(f))

Mangus acknowledges that as her knee healed from surgery walking became easier. (Dep. Mangus, p. 34) Further, she acknowledges that problems with her knee were limited to six months. (Dep. Mangus, pp. 299-300) Now, she can negotiate stairs and bend at the waist and at the knees with support. (Dep. Mangus, pp. 34-35, 293-296, 301, Ex. 1000A, B, C, D, JJ, 1000Q) Additionally, Mangus can now stoop to pick up things. (Dep. Mangus, pp. 35, 295, Ex. 1000D)

Mangus can walk distances and only uses a cane as necessary. (Mangus Dep. at 11, 41, 296-298, 303; Ex. 1000R, S, T, QQ, SS). She was observed in October 2003 walking over an hour at a job fair and then walking several blocks back to her car in

34

heeled shoes without the use of a cane. (Dep. Mangus, pp. 296-298, Ex. 1000P, R, S, T) While Mangus no longer goes to the half a dozen flea markets she used to, she can still go to garage sales and estate sales. (Dep. Mangus, pp. 66-67)

Mangus can now stand for periods of twenty to twenty-five minutes. (Dep. Mangus, Dep. pp. 61, 296-98, 303, Ex. 1000R, S, T, QQ, SS) However, her husband avers that he has observed that "her leg still swells and she has pain when she walks or stands on it for more than 15 minutes to a half hour." (Aff. Holliday, ¶ 12(a)) Mangus testified that she can now perform household chores. (Dep. Mangus, p. 57) From the period of June 2003 through today, Mangus can take care of herself, see, hear, speak, breathe, learn, think, analyze, communicate, and read. (Dep. Mangus, p. 64) Other than the April 4, 2003, note from Dr. Walsh restricting her from packing, Mangus' doctor placed no restrictions on her activities. (Dep. Walsh, p. 59) Mangus can lift dog food, and her current limitations regarding lifting her dogs has to do with their weight. (Dep. Mangus, pp. 55-56, 60, 299, 302, Ex. 1000BB, EE, OO) Her husband states in his affidavit that Mangus cannot squat because she cannot get up from a squatting position and that she can only lift items at a level where she does not need to bend her knee or use her leg to help with lifting. (Aff. Holliday, ¶ 12(e))

Metavante managers have never made negative comments about Mangus' knee. (Dep. Mangus, pp. 247, 251) Indeed, the only time Metavante managers saw Mangus after her knee injury was at the Ovation Award. (Dep. Mangus, p. 255)

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court considers the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c), Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324. A bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000).

## ANALYSIS

After defendants filed their motion for summary judgment, Mangus dismissed her claims of sex discrimination and age discrimination with prejudice. She asserts that the case now "focuses on discrimination because of a disability" (her knee). At the same time, she only addresses her failure to accommodate claim.

The ADA prohibits discrimination "against a qualified individual with a disability." 42 U.S.C. § 12112(a). To make a prima facie case of discrimination under the ADA, a plaintiff must show: (1) that she suffers from a disability; (2) that she is qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3) that she has suffered an adverse employment action as a result of her disability. *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005).

At the outset, Mangus has not argued that she suffered an adverse employment action as a result of her disability. Mangus was hired to work in Milwaukee.

36

She originally sought a Telecommuting Agreement because of personal financial problems. Mangus never argued that the conditions in Milwaukee were intolerable or that she was somehow forced by Metavante to work from a remote location.  When Metavante terminated her Telecommuting Agreement, it did not terminate her employment.  She would have remained a Project Manager with the same compensation and benefits, but simply would have worked in a different location.  The Seventh Circuit has explained that "a lateral transfer of an employee who retains the same salary and benefits is not, without more, sufficient to constitute an adverse employment action."  *Tyler v. Ispat Inland Inc.*, 245 F.3d 969, 972 (7th Cir. 2001) (stating that "not everything that makes an employee unhappy can form the basis of a federal discrimination suit").

In addition, there is no evidence that the decision to revoke the Telecommuting Agreement was either based on or in any way connected to Mangus' osteoarthritis.  The undisputed evidence in this record is that the decision makers at Metavante knew very little about Mangus' knee.  When he told Mangus that he was considering revoking the Telecommuting Agreement, Schultz knew that she had suffered an injury in October and had to be off work for a day.  Mangus never provided any medical documentation or otherwise requested an accommodation prior to her discussions with Human Resources after the termination of the Agreement.  There is a surprising dearth of medical evidence beyond the reference to osteoarthritis.  Hammer, like Schultz, decided to revoke the Telecommuting Agreement based on performance issues before she had any knowledge regarding the particulars of Magnus' knee injury or her diagnosis.

To the extent that Mangus has decided to proceed solely on her failure to accommodate claim, she must demonstrate that: 1) she was a qualified individual with a

37

disability; 2) that the employer was aware of her disability; and 3) the employer failed to reasonably accommodate the disability. *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005); *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). A person may also qualify as "disabled" under the ADA if an employer regards that person as having a substantially limiting mental or physical impairment. 42 U.S.C. § 12102(2)(C).

Mangus asserts that she is disabled because she has osteoarthritis in her left knee limiting her major life activities of "walking, standing, lifting, stooping (squatting) and kneeling." There is no dispute that osteoarthritis is a physical impairment, and she has identified major life activities such as walking. For example, the EEOC Regulations define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I). The issue that remains is whether osteoarthritis "substantially limited" one of the major life activities.

"[A] person is substantially limited by an impairment if that person is either unable to perform a major life activity or is significantly restricted as to the condition, manner, or duration under which the individual can perform the major life activity as compared to an average person in the general population." *Furnish v. SVI Sys. Inc.*, 270 F.3d 445, 448, 450 (7th Cir. 2001); 29 C.F.R. § 1630.2(j)(1). Not all impairments are disabilities with respect to the ADA. *See Furnish*, 270 F.3d at 450 (citing 29 C.F.R. §

Case 2:04-cv-00026-CNC    Filed 03/17/06    Page 38 of 42    Document 90

1630.2(j)(2)); *see also Ogborn v. United Food & Commercial Workers Union*, 305 F.3d 763, 767 (7th Cir. 2002); *Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir.1999).

Mangus admits that she was able to perform her job from October of 2002 through June of 2003, and that the problems with her knee were limited to six months. The last time she saw a doctor for her osteoarthritis was in June of 2003 even though she has had health insurance since December of 2003. She admits that the condition improved after surgery, and that she can now negotiate the stairs, bend at the waist and at the knees with support, stoop to pick up things, and uses a cane only as necessary. By October of 2003, Mangus was seen walking over an hour a job fair and then walking several blocks back to the car in heeled shoes without a cane. She can stand for periods of twenty to twenty-five minutes and perform household chores. Mangus admits that she can take care of herself, see, hear, speak, breathe, learn, think, analyze, communicate and read. By all accounts, her limitations caused by osteoarthritis were temporary in nature.

The ADA does not protect the temporarily disabled. *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1197 (7th Cir. 1997). In *Toyota Motor Manuf., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2001), the United States Supreme Court emphasized that the impairment's impact must be permanent or long term. *See* 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii) (2001). Intermittent, episodic impairments are not disabilities. *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995); *see, e.g., Fagan v. United Int'l Ins. Co.,* 128 F. Supp. 2d 182, 185-86 (S.D.N.Y. 2001) (finding no disability where plaintiff was fired while unable to work for two months following knee surgery).

In *Heimann v. Roadway Express*, Inc., 228 F. Supp. 2d 886, 907 (N.D. Ill. 2002), the court held that the plaintiff was not entitled to ADA protection when he suffered

Case 2:04-cv-00026-CNC   Filed 03/17/06   Page 39 of 42   Document 90

from carpel tunnel syndrome during a four-month period before his employer accommodated his need to drive only trucks with power steering. The court concluded that the "condition was clearly temporary" during that four-month period. Plaintiff's physician expected that plaintiff could return to full duty work within six to eight weeks following corrective surgery and "no one, including [p]laintiff's physicians knew that his condition was anything other than temporary." *Id.,* 228 F. Supp. 2d at 900.

Even if the court assumes that Mangus was a qualified individual with a disability and that Metavante was aware of the disability, Mangus cannot prevail because Metavante reasonably accommodated Mangus based on the information provided by Mangus at the time. The ADA requires "an employer to make whatever accommodations are reasonably possible in the circumstances to perform the functions essential to his position." *Miranda v. Wisconsin Power & Light Co.,* 91 F.3d 1011, 1017 (7th Cir. 1996). However, "it is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Jay v. Internet Wagner, Inc.,* 233 F.3d 1014, 1017 (7th Cir. 2000).

Mangus performed her job in Milwaukee competently, but issues arose when she attempted telecommuting because her house in Iowa had not sold. Mangus admits that there were communication issues and that she missed deadlines while working remotely. She further admits that Metavante had the right under their Telecommuting Agreement to terminate the agreement with two weeks notice, and that Metavante accommodated her by extending the deadline for moving from 30 to 90 days. The letter presented to Derkson, Manager of Employee Relations, by Mangus on April 4, 2003, states that it is the medical opinion of the doctor that Mangus' knee "would not tolerate the rigors

of packing her household and moving her goods to Milwaukee at this time. This restriction is in effect for an indefinite period of time. As an estimate I would say that this will be true for approximately the next six months or so." However, this letter does not state that she could not move to Milwaukee with assistance in packing. Nor does it state that she could not perform her job in Milwaukee. There were no other documented medical restrictions on Mangus. Further, Metavante did not require Mangus to pack and move her belongings. There are many steps Mangus could have taken following termination of the Telecommuting Agreement that would not require her to pack and bend her knee. For example, her husband could have packed with or without the assistance of others – including commercial movers – or she could have left her household goods in Iowa while her knee healed.

Metavante was not required to manufacture or otherwise create a position for Mangus in another department so that she could continue to telecommute. First, an employer is not required to move other employees to other positions to make a vacancy for a disabled employee "or create new positions. . . ." *Gile v. United Airlines, Inc.*, 213 F.3d 365, 374 (7th Cir. 2000). The ADA only obligates "an employer to reassign a disabled employee to a vacant position for which the employee is otherwise qualified." *Id.* Second, Mangus never contacted Human Resources for help, and only applied for three other positions. Two of these positions required extensive travel, and Mangus admits she could not travel. Metavante created the third position for which Mangus applied for an individual who was the subject of a reduction in force and had no performance issues. It is undisputed that the employee who was hired for the third position had skills that were needed in another area. Further, it is undisputed that each of the hiring managers for the

41

positions that Mangus sought felt that other persons were better qualified than Mangus. Moreover, there is no evidence that Schultz influenced the decisions of any of the hiring managers who had vacancies for which Mangus applied.

Most important, Metavante agreed to the Telecommuting Agreement in 2001 to accommodate Mangus who was then experiencing financial difficulties. Mangus did not perform as expected, and everyone involved felt that Mangus' performance was so lacking that she needed to return to Milwaukee. It is difficult to argue that continuation of the Telecommuting Agreement was a reasonable accommodation, whether indefinitely or for at least six months. Mangus had been extended an accommodation for a reason unrelated to her health and her performance was unsatisfactory. The same job with the same benefits was waiting for her in Milwaukee.

Now, therefore,

IT IS ORDERED that defendants' motion for summary judgment is granted.

IT IS FURTHER ORDERED that all motions in limine are denied as moot.

IT IS FURTHER ORDERED that this case be dismissed with prejudice.

Dated at Milwaukee, Wisconsin, this 17th day of March, 2006.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge